Mark H. Hutchings, Esq.
Nevada Bar No. 12783
John B. Lanning, Esq.
Nevada Bar No. 15585
**HUTCHINGS LAW GROUP**
400 S. 4th St., Suite 550
Las Vegas, Nevada 89101
Telephone: (702) 660-7700
Facsimile: (702) 552-5202
MHutchings@HutchingsLawGroup.com
John@HutchingsLawGroup.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DAVID BENGEL, an individual; PACIFIC GREEN ENERGY, LLC, a California limited liability company; APRICOT HOLDINGS, LLC, a Nevada limited liability company; APRICOT ENERGY LLC, a Nevada limited liability company; NEVADA SOLAR ENERGY, LLC, a Nevada limited liability company; FLORIDA SOLAR ENERGY, LLC, a Florida limited liability company; TEXAS SOLAR SERVICES, LLC, a Texas limited liability company, | Case No.: **PLAINTIFF'S COMPLAINT FOR:** **1. Trademark Infringement;** **2. False Designation of Origin;** **3. Trademark Dilution;** **4. Breach of Contract;** **5. Breach of the Implied Covenant of Good Faith and Fair Dealing; and** **6. Unjust Enrichment.** |
| Plaintiffs, | |
| v. | |
| EDMUND COUTAN, an individual; AURORA CONSULTING, LLC, a Nevada limited liability company; KUMQUAT SOLAR LLC, a Nevada limited liability company; KUMQUAT ENERGY LLC, a Nevada limited liability company; KUMQUAT HOLDINGS LLC, a Nevada limited liability company; DOES I through X, inclusive; ROE BUSINESS ENTITIES I through X, inclusive, | |
| Defendants. | |

Plaintiffs DAVID BENGEL; PACIFIC GREEN ENERGY, LLC; APRICOT

HOLDINGS, LLC; APRICOT ENERGY LLC; NEVADA SOLAR ENERGY, LLC;

FLORIDA SOLAR ENERGY, LLC; and TEXAS SOLAR SERVICES, LLC ("Plaintiffs") by

and through counsel, Hutchings Law Group, hereby files this Complaint against EDMUND

COUTAN; AURORA CONSULTING, LLC; KUMQUAT SOLAR LLC; KUMQUAT

ENERGY LLC; KUMQUAT HOLDINGS LLC; DOES I through X, inclusive, and ROE Business Entities I through X, inclusive (collectively "Defendants"). Plaintiff is informed and believes, and based thereon alleges, as follows:

## I.    **PARTIES**

1.    Plaintiff, DAVID BENGEL ("Plaintiff Bengel") is an individual who resides in County of Clark, State of Nevada. Plaintiff Bengel is the manager and owner of the entity Plaintiffs.

2.    Plaintiff PACIFIC GREEN ENERGY, LLC is a California limited liability company organized under the laws of the State of California and doing business in the County of Clark, State of Nevada.

3.    Plaintiff APRICOT HOLDINGS, LLC is a Nevada limited liability company organized under the laws of the State of Nevada and doing business in the County of Clark, State of Nevada.

4.    Plaintiff APRICOT ENERGY LLC is a Nevada limited liability company organized under the laws of the State of Nevada and doing business in the County of Clark, State of Nevada.

5.    Plaintiff NEVADA SOLAR ENERGY, LLC is a Nevada limited liability company organized under the laws of the State of Nevada and doing business in the County of Clark, State of Nevada.

6.    Plaintiff FLORIDA SOLAR ENERGY, LLC is a Florida limited liability company organized under the laws of the State of Florida and doing business in the County of Clark, State of Nevada.

7.    Plaintiff TEXAS SOLAR SERVICES, LLC is a Texas limited liability company organized under the laws of the State of Texas and doing business in the County of Clark, State of Nevada.

8.    Defendant EDMUND COUTAN is an individual, who upon information and belief resides in the County of Clark, State of Nevada. Defendant Edmund Coutan is a manager and owner of the entity Defendants.

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

9.    Defendant AURORA CONSULTING, LLC is a Nevada limited liability company organized under the laws of the State of Nevada and upon information and belief, is doing business in the County of Clark, State of Nevada.

10.    Defendant KUMQUAT SOLAR LLC is a Nevada limited liability company organized under the laws of the State of Nevada and upon information and belief, is doing business in the County of Clark, State of Nevada.

11.    Defendant KUMQUAT ENERGY LLC is a Nevada limited liability company organized under the laws of the State of Nevada and upon information and belief, is doing business in the County of Clark, State of Nevada.

12.    Defendant KUMQUAT HOLDINGS LLC is a Nevada limited liability company organized under the laws of the State of Nevada and upon information and belief, is doing business in the County of Clark, State of Nevada.

13.    Plaintiffs do not know the true names, capacities, or bases of liability of defendants sued as DOES I through X, inclusive, and ROE BUSINESS ENTITIES I through X, inclusive. These unknown defendants, and each of them, claim some right, title, estate, lien or interest in the Property adverse to Plaintiffs' interests; and their claims, and each such claim, constitute a cloud on Plaintiffs' title to the Property. Plaintiffs will amend this Complaint to reflect the true names of said unknown defendants when the same have been ascertained.

14.    Whenever it is alleged in this Complaint that a party did any act or thing, it is meant that such party's officers, agents, employees, or representatives did such act or thing and at the time such act or thing was done, it was done with full authorization or ratification of such party or was done in the normal and routine course and scope of business, or with the actual, apparent and/or implied authority of such party's officers, agents, servants, employees, or representatives. Specifically, parties are liable for the actions of their officers, agents, servants, employees, and representatives.

15.    Each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant are legally attributable to the other Defendants as each

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said acts, making each of the Defendants an agent of the other and making each of the Defendants jointly responsible and liable for the acts and omissions of each other as alleged herein.

## II.    JURISDICTION & VENUE

16.    Jurisdiction exists pursuant to U.S. Const., Article III, Section 2, which states that federal district courts can hear "all cases, in law and equity, arising under the Constitution of the United States and] the laws of the United States."

17.    28 USC 1331 gives basis for jurisdiction because the question set forth in this Complaint is relief under 15 U.S.C. § 1114 and 15 U.S.C. § 1125.

18.    28 USC 1367 gives this Court pendent jurisdiction over state law claims that are so related to claims in the action that the form a part of the same case or controversy.

19.    Venue is appropriate in this Court under 28 USC 1391(b)(2) because the events giving rise to this action occurred, at least partly, in Clark County, Nevada.

## III.    FACTS COMMON TO ALL CLAIMS

20.    Plaintiff David Bengel is successful solar industry entrepreneur who manages numerous successful businesses within the residential solar sales industry.

21.    Plaintiff David Bengel first met Defendant Edmund Coutan on or about November of 2018 when Plaintiff hired Defendant to be a sales representative in his solar sales business in Las Vegas, Nevada.

22.    Defendant Edmund Coutan began working as a solar sales representative for Plaintiffs soon after they were introduced.

23.    As the years progressed, Defendant Coutan eventually became a top salesperson for Plaintiffs, and was promoted, rewarded financially, and given increasing access to highly sensitive and confidential company information, including but not limited to: customer lists, unique methods, insider industry information, and intellectual property.

24.    On January 8, 2022, Plaintiffs and Defendant Edmund Coutan entered into an Independent Sales Representative Agreement (hereinafter "ISRA"), attached hereto as "Exhibit

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

A.," which reflects the most recent agreement terms between Plaintiff and Coutan.

25.    The ISRA is a valid and enforceable agreement between certain Plaintiffs (Pacific Green Energy, LLC; Nevada Solar Energy LLC; Florida Solar Energy, LLC; and Texas Solar Services, LLC) and Defendant Aurora Consulting LLC.

26.    This contract contained a valid and enforceable, non-competition clause, non-solicitation clause, and non-disclosure agreement.

27.    Defendants have breached this agreement by soliciting Plaintiffs' customers and forming business entities (Defendants Kumquat Solar and Kumquat Energy) that are in direct competition with Plaintiffs, unlawfully make use of Plaintiffs' intellectual property in such a way that could only be part of a scheme to confuse Plaintiff's current and potential customers as well as the general consumer public.

**Apricot's Strong and Well-Known Marks**

*Apricot Solar*

28.    Apricot Solar is a residential solar company operating since 2018 and based in Las Vegas, Nevada.

29.    Apricot Solar has developed an excellent reputation as a leader in the residential solar industry.

30.    Apricot Solar has developed and used in commerce certain names, logos, color schemes, branding, other trademarks, trade dress and identifying indicia.

31.    Apricot Solar has engaged in the continuous and extensive use of the marks since 2019 and have developed immense goodwill and strength as brand identifiers.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

32.    Apricot Solar uses the distinctive trademark and slogan included below:



33.    Apricot's logo is as follows:



34.    Kumquat Solar has adopted the same distinctive citrus color tone, rounded font style, citrus fruit name identifier followed by the word "solar," leaf abstraction within the logo, and slogan as Apricot Solar, making the two brands confusingly similar.



**PLAINTIFFS' COMPLAINT**

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

35.     A side-by-side comparison of Apricot Solar's T-shirts (worn by David Coutan in the middle) and Kumquat Solar's T-shirts are set forth below:

 

36.     Of all of the possible options Mr. Coutan could have adopted to create a new solar company, it is no mistake that he intentionally copied Apricot.  Coutan created a brand identical to Apricot with the knowledge that he would confuse the public, make an association between the two companies to facilitate a transition of customers from Apricot to Kumquat, and to otherwise take advantage of the goodwill, expertise, brand recognition, trade dress and intellectual property developed by Apricot over the course of several years.  In other words, Coutan created the Kumquat brand to deliberately steal Apricot's intellectual property, goodwill, and customer base.

*Apricot Energy*

37.     Apricot Energy is an energy drink company operating since 2019 and based in Las Vegas, Nevada.

38.     Apricot Energy has developed an excellent reputation as an innovative energy drink beverage and luxury brand.

39.     Apricot Energy has developed and used in commerce certain names, logos, color

HUTCHINGS LAW GROUP

400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

1  schemes, branding, other trademarks, trade dress and identifying indicia.

2      40.    Apricot Energy has engaged in the continuous and extensive use of the marks

3  since 2019 and have developed immense goodwill and strength as brand identifiers.

4      41.    Kumquat has also developed a brand of energy drinks, again directly copying the

5  design, style, marketing strategy, trade dress, identifying marks, and other intellectual property

6  of Apricot.

7      42.    A side-by-side comparison of the Apricot Energy can with the Kumquat Energy

8  can is set forth below:



21      43.    Coutan adopted the same distinctive citrus color tone, rounded font style, citrus

22  fruit name identifier followed by the word "energy," leaf abstraction within the logo, and healthy

23  energy drink approach as Apricot Solar, making the two brands confusingly similar.

24      44.    In recognition of the distinctiveness and source-identifying function of Apricot

25  Solar, Plaintiffs have obtained the following incontestable trademark registrations from the

26  United States Patent and Trademark Office ("USPTO") protecting the Apricot Solar Mark:

27

28

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Jun 7 03:47:22 EDT 2023*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout **Please logout when you are done to release system resources allocated for you.**

## Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status | **( Use the "Back" button of the Internet Browser to return to TESS)**

# APRICOT SOLAR

| | |
|---|---|
| **Word Mark** | **APRICOT SOLAR** |
| **Goods and Services** | IC 035. US 100 101 102. G & S: promoting and marketing solar energy systems. FIRST USE: 20190615. FIRST USE IN COMMERCE: 20190615 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 88840172 |
| **Filing Date** | March 19, 2020 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | September 28, 2021 |
| **Registration Number** | 6585780 |
| **Registration Date** | December 14, 2021 |
| **Owner** | (REGISTRANT) Apricot Holdings, LLC LIMITED LIABILITY COMPANY NEVADA No. 303 2835 W. Pebble Road Las Vegas NEVADA 89123 |
| **Attorney of Record** | Rachel Blue |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SOLAR" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

45.     In recognition of the distinctiveness and source-identifying function of Apricot Energy, Plaintiffs have obtained the following incontestable trademark registrations from the United States Patent and Trademark Office ("USPTO") protecting the Apricot Energy Mark:

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

United States Patent and Trademark Office
Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Jun 7 03:47:22 EDT 2023*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout Please logout when you are done to release system resources allocated for you.

## Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

# Apricot Energy

| | |
|---|---|
| **Word Mark** | **APRICOT ENERGY** |
| **Goods and Services** | IC 032. US 045 046 048. G & S: Apricot flavored Energy drink, canned 12oz energy drink. FIRST USE: 20210301. FIRST USE IN COMMERCE: 20210301 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 97042529 |
| **Filing Date** | September 23, 2021 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Date Amended to Current Register** | September 29, 2022 |
| **Registration Number** | 6914694 |
| **Registration Date** | November 29, 2022 |
| **Owner** | (REGISTRANT) Apricot Energy LLC LIMITED LIABILITY COMPANY NEVADA 817 South Main St Las Vegas NEVADA 89101 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "ENERGY" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | TRADEMARK |
| **Register** | SUPPLEMENTAL |
| **Live/Dead Indicator** | LIVE |

46.     Sometime in early 2023, the relationship between Plaintiff David Bengel and Defendant Edmond Coutan soured.

47.     Kumquat Solar and Kumquat Energy are a solar and energy drink company, based in and operating in Las Vegas, Nevada.

48.     In an effort to create brand confusion and a false association between Apricot and

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

1  Kumquat, Defendant Coutan founded Kumquat Solar and Kumquat Energy drinks to compete
2  with Apricot after his relationship with Plaintiff deteriorated.

3      49.    An apricot is a small orange colored fruit, and many elements of the apricot fruits
4  color and attributed were incorporated into the trademarked materials and branding for both
5  Apricot Solar and Apricot Energy.

6      50.    A kumquat is a small orange colored fruit, very similar in appearance and exotic
7  in nature to an Apricot.

8      51.    Defendants, by forming a solar and energy drink business with a near identical
9  name (that of a small orange fruit), identical color scheme, identical font use, identical branding
10  strategy, identical logo, identical slogan, and identical stylization acted so as to confuse
11  consumers, interfere with interstate commerce, and infringed directly on the Apricot Solar and
12  Apricot Energy Trademarks.

13  **IV.    CAUSES OF ACTION**

14
                        **FIRST CAUSE OF ACTION**
                **TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114**
15                              **(Against All Defendants)**

16      52.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 51 above
17  as fully set forth herein.

18      53.    The federally registered and incontestable Apricot Solar and Apricot Energy
19  Trademarks are Trademarks used in interstate commerce in the United States and are widely
20  recognized by the general consuming public of the United Stated as a distinctive brand, color
21  scheme, and design, belonging exclusively to Plaintiffs.

22      54.    The Apricot Solar and Apricot Energy Trademarks are valid and enforceable
23  against third parties, including Defendants.

24      55.    Defendants' use in commerce of the Kumquat Solar and Kumquat Energy brands
25  as set forth in detail herein, are likely to cause, have caused, and will continue to cause confusion,
26  mistake, deception, and a false association in the minds of consumers with the Apricot Solar and
27  Apricot Energy brands as to the source, origin, or sponsorship of products.

28      56.    Defendants have reproduced, counterfeited, copied, or engage in the colorable

imitation of the registered marks of Apricot Solar and Apricot Energy and have applied those marks to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

57.    Defendants' unauthorized use of advertisement and promotion materials distributed on social media and elsewhere and the promoting of its own products in interstate commerce, as set forth more fully elsewhere herein, constitutes infringement of a registered Trademark in violation of Section 32 of the Lanham Act.

58.    Defendants acted with full knowledge that their actions would cause confusion or mistake and deceive customers, which constitutes a willful violation of the Lanham Act.

59.    As a result of these actions, Plaintiffs have suffered irreparable injury and, unless Defendants' infringement is enjoined by the Court, Plaintiffs will continue to suffer such harm. There is no adequate remedy at law for the harm caused by Defendants' infringing conduct. Defendants are entitled to damages as set forth in 15 U.S.C. 1114.

60.    As a direct and proximate result of Defendants' willful trademark infringement, Plaintiffs have been forced to retain counsel to prosecute this claim and are entitled to recover their attorneys' fees and costs incurred in brining and prosecuting these claims.

## SECOND CAUSE OF ACTION
### FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a)
### (Against All Defendants)

61.    Plaintiffs re-allege the allegations in paragraphs 1 through 60 above as though fully set forth herein.

62.    The Apricot Solar and Apricot Energy Trademarks are federally registered Trademarks used in interstate commerce in the United States and are widely recognized by the general consuming public of the United Stated as a distinctive brand, color scheme, and design, belonging exclusively to Plaintiffs.

63.    Defendants' imitation of the Apricot Solar and Apricot Energy trademarks and the use of other source-identifying indica of Apricot, including but not limited to color scheme,

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

font design, logo design, use of distinguishing flairs, apparel design, and social media presence, has caused and is likely to continue to cause confusion, mistake, false association, and/or to deceive consumers and potential consumers concerning an affiliation, connection, or association between Apricot Solar/Apricot Energy and Kumquat Solar/Kumquat Energy, when there is, in truth, no such affiliation, connection, or association.

64.     Defendants' activities, as alleged herein, have a substantial effect on interstate commerce.

65.     Defendants' activities, as alleged herein, constitute an unlawful use in commerce of any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact within the meaning of 15 U.S.C. § 1125(a).

66.     Defendants willfully intended to trade on the recognition and reputation of the Apricot Solar and Apricot Energy mark, trade name, or trade dress.  Defendants acted with full knowledge that its actions would cause confusion or mistake and deceive consumers.

67.     As a result of Defendants' actions, Plaintiffs have suffered irreparable injury, and unless Defendants' infringement is enjoined by the Court, Plaintiffs will continue to suffer such harm.  There is no adequate remedy at law for the harm caused by Defendants' conduct. Plaintiffs are entitled to injunctive relief for the illegal acts of the Defendants.

68.     Plaintiffs are entitled to damages as allowed by 15 U.S.C. § 1125.

69.     Plaintiffs have been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests an award of attorney fees and costs of suit as provided by any applicable contract, rule, or statute.

**THIRD CAUSE OF ACTION**
**TRADEMARK DILUTION UNDER 15 U.S.C. § 1125(c)**
**(Against All Defendants)**

70.     Plaintiffs re-allege the allegations of paragraphs 1 through 69 above as though fully set forth herein.

71.     The federally registered and incontestable Apricot Solar and Apricot Energy Trademarks are well-known and used in interstate commerce in the United States and widely

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

recognized by the general consuming public as identifying Apricot Solar and Apricot Energy, who engage in the business of selling both residential solar panels and energy drinks. Apricot Solar is among the most notable marks in the residential solar industry and has been continuously used since 2019 to promote the goods and services offered by Apricot Solar.

72.    Defendants' conduct, as outlined above, has diluted and blurred the distinctiveness of the Apricot Solar and Apricot Energy Marks through the use of colorable imitation of the Apricot Solar and Apricot Energy Trademarks for unauthorized commercial purposes.

73.    As a result of Defendants' conduct, Plaintiffs are likely to suffer, have suffered, and will continue to suffer significant harm and deterioration of business and goodwill unless Defendants' unlawful conduct is restrained. There is no adequate remedy at law for the harm caused by Defendants' unlawful conduct.

74.    Defendants' conduct has been undertaken with a willful intent to trade on Apricot Solar and Apricot Energy's reputation and to cause dilution to the Apricot Solar and Apricot Energy Trademark, entitling Plaintiff to all remedies set forth in 15 U.S.C. 1125(c)(5).

75.    Plaintiffs has been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests and award of attorney fees and costs of suit as provided by any applicable contract, rule, or statue.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT
**(Against All Defendants Aurora Consulting LLC and Edmund Coutan)**

76.    Plaintiffs re-allege the allegations of paragraphs 1 through 75 above as though fully set forth herein.

77.    Plaintiffs Nevada Solar Energy, LLC; Pacific Green Energy, LLC; Florida Solar Energy, LLC, and Texas Solar Services, LLC entered into a contract with Defendant Aurora Consulting, LLC known as the Independent Sales Representative Agreement (hereinafter "ISRA"), attached hereto as "Exhibit 1."

78.    The ISRA is a valid and legally enforceable binding contract entered into by Plaintiffs and Defendant Aurora Consulting. It was signed by Plaintiff David Bengel on behalf

1    of Plaintiffs and by Defendant Edmund Coutan on behalf of Defendant Aurora Consulting, LLC.

2    79.    Plaintiffs fully performed their obligations under the ISRA and Defendants

3    Aurora Consulting, LLC and Edmund Coutan have not disputed their performance.

4    80.    Defendants Aurora Consulting, LLC and Edmund Coutan breached the ISRA,

5    specifically the non-solicitation clause and non-disclosure clause by stealing Plaintiffs'

6    intellectual property to open not one, but two business (Kumquat Solar and Kumquat Energy)

7    that are near carbon copies of Apricot Solar and Apricot Energy.

8    81.    Upon information and belief, Defendant Edmund Coutan, through Kumquat Solar

9    and Kumquat energy, have solicited both customers and suppliers of his former Company in

10   direct violation of the non-disclosure agreement and non-solicitation clause contained in the

11   ISRA.

12   82.    The Plaintiffs business is a unique property interest worthy of protection through

13   injunctive relief.

14   83.    The Defendants violation of the terms and conditions of the ISRA is continuous,

15   immediate, and ongoing, and the harm sustained by Plaintiffs is irreparable.

16   84.    As a direct result of Defendants Aurora Consulting, LLC and Edmund Coutan's

17   breaches, Plaintiffs have incurred damages in excess of $15,000.00.

18   85.    Plaintiffs continue to be damaged by Defendants' actions.

19   86.    Plaintiffs have been forced to retain the services of an attorney due to the wrongful

20   conduct of Defendants and therefore requests an award of reasonable attorney fees and costs of

21   suit as provided by any applicable contract, rule, or statute.

22   **FIFTH CAUSE OF ACTION**
     **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
23   **(Against Defendants Aurora Consulting, LLC and Edmund Coutan)**

24   87.    Plaintiffs re-allege the allegations of paragraphs 1 through 86 above as though

25   fully set forth herein.

26   88.    The ISRA is a legally enforceable and binding contract entered into by Plaintiffs

27   and Defendants Aurora Consulting, LLC and Edmund Coutan.

28   89.    A covenant of good faith and fair dealing is implied in every contract in Nevada,

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

including the ISRA.

90.     Plaintiffs had a justified expectation that they would receive the benefit of the bargain under the ISRA and that Defendants would comply with the ISRA's terms and conditions.

91.     Defendants Aurora Consulting, LLC and Edmund Coutan breached the implied covenant of good faith and fair dealing by, among other things, knowingly soliciting former and current clients, suppliers, and other valuable industry contacts of Plaintiffs; and by stealing the branding, logo, business model, and other intellectual property of Plaintiffs to set up a competitor business curiously identical to Plaintiffs.

92.     As a results of Defendants Aurora Consulting, LLC and Edmund Coutan's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in excess of $15,000.00.

93.     Plaintiffs have been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests an award of reasonable attorney fees and costs of suit as provided by any applicable contract, rule, or statute.

## SIXTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(Against Defendants Aurora Consulting, LLC and Edmund Coutan)**

94.     Plaintiffs re-allege the allegations of paragraphs 1 through 93 above as though fully set forth herein.

95.     Plaintiffs conferred a substantial benefit upon Defendants Aurora Consulting, LLC and Edmund Coutan by giving access to customer information, supplier information, intellectual property, and other valuable solar industry insider information in relation to the operation of Aurora Consulting, LLC's business as an independent sales representative for Plaintiffs.

96.     Given the nature of these benefits, it would be inequitable to allow Defendants Aurora Consulting, LLC and Edmund Coutan to accept and retain this benefit without repayment for the full value thereof.

97.     Defendants Aurora Consulting, LLC and Edmund Coutan accepted and retained

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

these benefits.

98.    Defendants Aurora Consulting, LLC and Edmund Coutan knew, or should have known that Plaintiffs expected not to have its clients and potential clients solicited by Defendants.

99.    Defendants Aurora Consultlng, LLC and Edmund Coutan have solicited current, former, and potential clients of Plaintiffs and used the intellectual property of Plaintiffs to create a near identical business to confuse and attract the clients and potential clients of Plaintiffs.

100.    Plaintiffs have demanded that Defendants Aurora Consulting, LLC and Edmund Coutan pay money for the damages it has sustained. To date, Defendants have failed and/or refused to pay Plaintiffs for the full value of these benefits and have thus been unjustly enriched in an amount to be proven at time of hearing.

101.    Plaintiffs have been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests an award of reasonable attorney fees and costs of suit as provided by any applicable contract, rule, or statute.

### INJUNCTIVE RELIEF

102.    Plaintiffs re-allege the allegations of paragraphs 1 through 101 above as though fully set forth herein.

103.    Pursuant to Fed. R. Civ. Proc. 65 and NRS 33.010, Plaintiff seeks Orders for preliminary injunction, permanent injunction, and specific performance against Defendants as follows:

    a.    Perpetually prohibiting Defendants from infringing on the Trademarks, trade names, service names, service marks, or other marks of Plaintiffs.

    b.    Perpetually prohibiting Defendants from disclosing, disseminating, or using the Confidential Information of Plaintiff Pacific Green Energy, LLC, which includes "any information which has commercial value and is either: (i) technical information, including patent, copyright, trade secret, and/or other proprietary information, techniques, sketches, drawings, models, inventions, know-how, processes, apparatus, instrument, equipment, algorithms, software programs, software source

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

documents, and formulae related to the current, future and proposed products and services of PGE; or (ii) non-technical information relating to PGE's products and/or services, including without limitation pricing, margins, merchandising plans and strategies, finances, financial and accounting data and information, suppliers, customers, customer lists, purchasing data, sales and marketing plans, future business plans and any other information which is proprietary and confidential to PGE."

c. Perpetually prohibiting Defendants from disclosing, disseminating, or using the Proprietary Information of Plaintiffs, which includes "all information that was or will be disclosed to Independent Contractor by Company or that was or will be developed, learned, created, or discovered by Independent Contractor (or others) for or on behalf of Company, or that became or will become known by, or was or i s conveyed to Company and has commercial value in Company's business, or that is developed at Company's facilities or with use of Company's equipment. Proprietary Information includes, but is not limited to, information (and all tangible items in any form incorporating, embodying or containing information) relating to: (i) all client/customer (including any potential clients/customers) lists, vendor lists and all lists or other compilations containing client, customer or vendor information (including any potential clients or customers); (ii) the CRM System; (iii) products, proposed products, research, product development, know-how, techniques, processes, costs, profits, advertising, advertising plans, markets, marketing plans, strategies, forecasts, sales and commissions, and unpublished information relating to technological and scientific developments; (iv) plans for future development and new product concepts; (v) all manufacturing or installation techniques or processes, documents, books, papers, drawings, schematics, models, sketches,

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

computer programs, databases, and other data of any kind and descriptions including electronic data recorded or retrieved by any means; (vi) the compensation, performance and other terms regarding Company's employees and independent contractors; (vii) software in various stages of development, and any designs, drawings, schematics, specifications, techniques, models, data, source code, algorithms, object code, documentation, diagrams, flow charts, research and development, processes and procedures relating to any software; and (viii) all other information that has been or will be given to Independent Contractor in confidence by Company (or any affiliate) concerning Company's actual or anticipated business, research or development, or that is received in confidence by or for Company from any other person or entity.

d.   Perpetually prohibiting Defendants from making, causing to be made, directly or indirectly, any false, misleading, defamatory, derogatory, or abusive statement to any third party against Plaintiffs, their brands, service names, fictitious business names, affiliates, current and former directors, current and former officers, current and former employees, known agents and current and former independent contractors.

104.   Plaintiffs have a likelihood of success on the merits as set forth more fully within this Complaint. Defendants have committed an egregious "copy and paste" of Plaintiffs companies using the same trademarks and a highly similar name and branding. Defendants have brazenly violated the restrictive covenants set forth within the ISRA, for which the ISRA expressly provides Plaintiff with a right to injunctive relief.

105.   The statutory and regulatory law is explicit, Defendants have willfully and flagrantly infringed on Plaintiffs' Trademarks.

106.   Defendants breach of the ISRA has resulted in irreparable and continuing damage to Plaintiffs for which there will be no adequate remedy at law.

107.   If injunctive relief and specific performance are not awarded, Plaintiffs have

suffered and will continue to suffer irreparable harm for which economic damages are not a sufficient remedy in the form of harm to Plaintiffs' business, reputation and brand, loss of customers and prospective business due to the unavoidable confusion created by Kumquat's design and use of Plaintiffs' trademarks, and reputational damage and confusion among consumers, and due to Defendants violation of the restrictive covenants within the ISRA.

108.    Plaintiffs stand ready to post bond as adequate security for costs and damages in the event of wrongful enjoinment.

109.    Plaintiffs have been forced to retain the services of an attorney due to the wrongful conduct of Defendants and therefore requests an award of reasonable attorney fees and costs of suit as provided by any applicable contract, rule, or statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For Injunctive Relief and Specific Performance as set forth above;

2.    For an award of all actual, compensatory, consequential, incidental, prospective, reputational, specific and general damages resulting from Defendants' wrongful conduct, in an amount to be established according to proof at trial;

3.    For an award of nominal damages;

4.    For an award of punitive damages;

5.    For an award of attorney fees and costs;

6.    For pre and post judgment interest; and

7.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: July 17, 2023                    HUTCHINGS LAW GROUP

*/s/ Mark H. Hutchings*

By:_____
Mark H. Hutchings, Esq.
NV Bar. No. 12783
400 S. 4th St. Suite 550
Las Vegas, NV 89101
Telephone: (702) 660-7700
mhutchings@hutchingslawgroup.com

HUTCHINGS LAW GROUP
400 S. 4TH ST. SUITE 550
LAS VEGAS, NV 89101

# EXHIBIT A

# INDEPENDENT SALES REPRESENTATIVE AGREEMENT

THIS INDEPENDENT SALES REPRESENTATIVE AGREEMENT ("**Agreement**") is between Nevada Solar Energy, LLC, for the services and/or benefit of Nevada Solar Energy, LLC, a Nevada limited liability company, Pacific Green Energy, LLC, a California limited liability company, Florida Solar Energy, LLC, a Florida limited liability company, and Texas Solar Services, LLC, a Texas limited liability company (collectively, the "**Company**") and ‗‗‗‗Edmund Coutan‗‗‗‗‗‗‗‗[for example, JANE DOE SERVICES, LLC], a ‗‗Individual‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ [for example, a California limited liability company] ("**Independent Contractor**"), collectively referred to as "**Parties**" and is dated as of ‗‗‗10 / 05 / 2020‗‗‗‗‗‗‗‗‗‗ and the parties agree as follows.

1. Appointment as Sales Representative. Company hereby appoints Independent Contractor, and Independent Contractor accepts such appointment, as an independent sales representative for Company to engage in marketing, consulting, and/or selling solar systems "(**Solar Systems**") offered by Company in obtaining orders or contracts for Solar Systems.

2. Independent Contractor Status. Independent Contractor is not an employee of Company for any purpose whatsoever, including local, state and federal taxes and workers' compensation insurance, but is an independent contractor. Neither this Agreement, the relationship created between parties hereto pursuant to this Agreement, nor any course of dealing between the parties hereto is intended to create, or will create, an employment relationship, a joint venture, partnership or any similar relationship. Company is interested in the results obtained by Independent Contractor, who is responsible for the manner and means of performing under this Agreement. Independent Contractor does not have, nor will Independent Contractor hold himself/herself/itself out as having, any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of, or binding Company, or to pledge Company's credit, or to extend credit in Company's name unless expressly authorized to do so by Company and, if so authorized, then only to the extent so authorized. Independent Contractor's relationship with Company is further defined as below:

   a. Company will not withhold any monies for any local, state or federal taxing authorities from compensation earned by Independent Contractor pursuant to this Agreement. Company will prepare and file a Form 1099 with the Internal Revenue Service reporting the compensation paid to Independent Contractor if such reporting is required by law.

   b. Independent Contractor will pay any and all taxes (local, state, federal or foreign) owed on any compensation received by Independent Contractor pursuant to this Agreement.

   c. Neither Independent Contractor nor any of Independent Contractor's agents or employees will receive any fringe benefits under this Agreement or from Company whatsoever, and accordingly, will receive no insurance benefits, disability income, pension, 401(k), vacation, holiday pay, sick pay, expense reimbursement or any other benefits.

   d. Company will not provide any workers' compensation coverage for Independent Contractor or any of Independent Contractor's agents or employees. Any and all workers' compensation coverage will be the sole responsibility of Independent Contractor.

   e. Company will not provide any employment insurance coverage for Independent Contractor or any of Independent Contractor's agents or employees. Any and all employment insurance remittances will be the sole responsibility of Independent Contractor.

   f. Independent Contractor will be solely responsible for all expenses incurred by Independent Contractor, including travel, entertainment, dues, subscriptions, computer and other office expenses, and any licenses, and will receive no remuneration or reimbursement of any

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

nature whatsoever other than the commissions referred to herein, and no expenses incurred by Independent Contractor will be charged to Company.

 g. Independent Contractor will be responsible for establishing (and paying the expense of) Independent Contractor's office.

 h. Independent Contractor will have complete discretion and control over the time and manner of performing marketing and sales services provided under this Agreement.

3. <u>Business Licenses and Compliance.</u> Independent Contractor represents and warrants that itself, its employees and/or agents comply and will continuously comply with all federal, state, and local laws requiring business license and certificates required to carry out the services to be performed under this Agreement and shall continuously comply with applicable laws in marketing and obtaining orders for Solar System.

4. <u>Effectiveness and Termination.</u>

 a. This Agreement will begin on the date first written above and will continue on an indefinite basis until terminated by either Independent Contractor or Company in accordance with this Section 4. Notwithstanding anything in this Agreement to the contrary, express or implied, or in any previous relationship between Independent Contractor and Company (or its affiliates or predecessors), if any, either Independent Contractor or Company may terminate this Agreement (and Independent Contractor's service with Company) at will at any time, with or without cause, by giving to the other party at least ten (10) days advance written notice.

 b. This Agreement and Independent Contractor's service may be terminated by Company immediately and without notice for "cause", which will include any material act of dishonesty by Independent Contractor, wrongful disclosure of Proprietary Information by Independent Contractor, any gross negligence or willful misconduct by Independent Contractor, breach of any of Independent Contractor's duties under this Agreement or any act or omission by Independent Contractor that has a material adverse effect on Company, its business or its reputation.

 c. In case of termination for cause or if there is reasonable grounds that the Independent Contractor breached any statute or regulation or provision of this Agreement, the Company may withhold compensations of Independent Contractor, as may be reasonable under the circumstances, until the dispute, customer complaint, fines and/or penalty is/are resolved, settled or released or not later than sixty (60) days from termination for cause. Upon determination that Independent Contractor is responsible for expenses, settlement cost and/or damages, fines or penalties, the withheld compensation will be used to pay for such expenses, settlement cost, damages, fines or penalties.

5. <u>Customers</u>. Independent Contractor may attempt to sell Company's Solar Systems to any potential customer other than any person or entity entered into the CM System (as defined below) by Company as a lead belonging to any sales representative other than Independent Contractor. All lists of customers and potential customers are the sole and exclusive property of Company and constitute Proprietary Information under Section 14, below.

6. <u>Compensation</u>. All of Independent Contractor's compensation will be paid in the form of a commission calculated as described in the Apricot Pay Plan. Pursuant to this Agreement, Independent Contractor is entitled to receive commission payments for Solar Systems sold and installed.

 a. <u>Period, Calculation and Payment</u>. A periodic statement will be issued by Company to Independent Contractor detailing: (i) the sales, credits, debits and expenses for the preceding period for all orders obtained by Independent Contractor; and (ii) any and all taxes, excises, freight, charges or fees imposed by any finance company, commissions paid to any call

center personnel, charges imposed or levied by any authority, returns, any refunds or credits issued by Company related to any orders obtained by Independent Contractor and any offsets for any orders for which Independent Contractor previously received any commission payments and for which the Company does not receive payment in full of the amount owed by the customer or a finance company regarding such order. Any commissions owed to Independent Contractor will be calculated and paid on a weekly basis. If Independent Contractor earns a commission on the sale of a Solar System, that commission will be paid by Company in two (2) payments.

b. <u>Potential Commission Modification</u>. The commission rates specified in Section 6(a) and in the periodic Apricot Solar Advisor Compensation Schedule may be changed by Company in its sole discretion at any time and effective immediately upon notice by any one or all of the following: (i) via Slack in the Company Sales Team Announcements channel; (ii) via email; and/or (iii) via the training and resources section contained in the Company website. When Company gives written notice of a new commission rate structure to Independent Contractor, if Independent Contractor does not terminate this Agreement within ten (10) days thereafter pursuant to Section 4(a), such new commission rate structure will take effect on the effective date specified in such notice and Section 6(a) of this Agreement and the periodic Apricot Solar Advisor Compensation Schedule will be deemed to have been accepted by the Independent Contractor and duly amended to reflect the new commission structure as specified in such notice.

c. <u>Offsets</u>. If Company issues a refund, credit or disburses funds under this Section 6 in connection with any amount paid or to be paid for any Solar System for which Independent Contractor has received a commission payment, Company will offset such amount against any withheld or future commission amounts that would otherwise be paid to Independent Contractor pursuant to Section 6(a). For example, only and not by way of limitation, if Company issued a $2,000.00 refund or credit to a customer or finance company regarding a Solar System for which Independent Contractor had received a commission payment pursuant to Section 6, Company will offset said $2,000.00 against any commissions thereafter owed to Independent Contractor pursuant to Section 6 and any such future commission payments would thus be reduced by $2,000.00.

If for any reason Company does not receive full payment of all amounts owed by a customer or finance company for an order for which Independent Contract has received a commission payment, the amount of commission paid to Independent Contractor regarding such order will be offset against any future commission amounts that would otherwise be paid to Independent Contractor pursuant to Section 6. For example, only and not by way of limitation, if Contractor received $2,000.00 commission or an order for which Company does not receive full payment of any amount owed by a customer or a finance company regarding that order, Company will offset said $2,000.00 against any commissions thereafter owed to Independent Contractor pursuant to Section 6 and any such future commission payments would thus be reduced by $2,000.00.

If an order obtained by Independent Contractor is cancelled by a customer at any time, the total amount of expenses incurred by Company regarding that cancelled order may (at Company's sole discretion) be offset against any future commission amounts that would otherwise be paid to Independent Contractor pursuant to Section 6. If an order obtained by Independent Contractor is cancelled by a customer at any time after Company (or any of its agents or subcontractors) has applied for a permit to install that Solar System, there will be a $500.00 cancellation fee and that fee will be offset against any future commission amounts that would be otherwise paid to Independent Contractor pursuant to Section 6.

If any gross negligence, and/or willful or reckless misconduct by Independent Contractor causes Company to incur any expenses or suffer any damages, the total amount of such expenses and/or damages may (at Company's sole discretion) be offset against any future commission amounts that would otherwise be paid to Independent Contractor pursuant to Section 6.

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

For purposes of example only and not by way of limitation, if Company incurred $2,000 in expenses on an order that was cancelled by a Customer after Company applied for a permit to install that Solar System and Company suffered an additional $1,000 in damages due to Independent Contractor's negligence (and Company elected to offset such expenses and damages against commissions owed to Independent Contractor), Company will offset $2,500 ($1,000 + $1,000 + $500 (with $500 being the cancellation fee) = $2,500) against any commissions thereafter owed to Independent Contractor pursuant to Section 6 and any such future commission payments would thus be reduced by $2,500. Company's offset rights pursuant to this Section 6(c) are in addition to (not in lieu of) any other legal or equitable remedies Company may elect to pursue if there any expenses or damages caused by Contractor's reckless and/or willful misconduct.

If the Independent Contractor's realization rate for signed solar agreements originating from Company-provided potential customer solar leads falls below 45% during any concurrent period lasting 60 days or more, Company may, in its sole discretion, offset its marketing costs and expenses related to Company's marketing  over that same 60 day period.

d.  <u>Withholding of Commission</u>. If the Company received a complaint or dispute related to solar agreements sold by the Independent Contractor, the Company may withhold any and all compensation from such contract until the dispute is resolved. Complaints may include, but not be limited to: misrepresentations made by the Independent Contractor to the customer, promises made by the Independent Contractor to customer that are outside of the Supply and Installation Agreement and/or discounts, rebates, incentives not authorized by the Company.

   i.  The Independent Contractor also expressly agrees to defend and/or assist the Company in defending against such complaint or dispute which shall require full disclosure of facts and circumstances, before and/or after the negotiation, sale and/or signing of the disputed contract. The Independent Contractor may be required to execute a written statement and/or testify about such facts and circumstances that may be used for purposes of an internal investigation, administrative and/or judicial proceedings.

   ii.  If it is determined that the Independent Contractor made promises and/or representations that are neither covered by the Supply and Installation Agreement nor authorized by the Company, the additional cost for such promises and/or representations shall be borne by the Independent Contractor and shall be deducted from his/her withheld and future compensation until the entire cost is fully satisfied.

   For purposes of example only: If the Independent Contractor makes a promise to the customer that, "He/She will receive a free HVAC Air Conditioning System in exchange for signing the Supply and Installation Agreement" this would be a false representation and/or false promise made by the Independent Contractor and the Independent Contractor will be responsible to pay for the cost of the unauthorized goods and/or services that were wrongly promised to the customer.

e.  <u>Compensation After Termination</u>. In the event of any termination of this Agreement, the compensation to be paid by Company to Independent Contractor in full satisfaction of Independent Contractor's services will be a full commission on orders obtained by Independent Contractor for: (i) all installations of Solar Systems made prior to termination; and (ii) all post-termination installations of Solar Systems for Paid Orders that were obtained by Independent Contractor prior to termination ("**Paid Orders**" means orders that have been accepted by Company and on which the customer has paid the amount of deposit required by Company). In all other situations, no commission will be paid for any orders received or sales made after termination. Any commissions earned and to be paid

after any termination of this Agreement pursuant to this Section 6(e) will be calculated

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

and paid as provided in Sections 6(a) through 6(e); provided, however, that any commission owed to Independent Contractor following any termination of this Agreement may be held by Company, at its discretion or until the Project reaches the final completed stage. If following any termination of this Agreement the remaining offsets pursuant to Section 6(c) exceeds the amount of any commissions owed to Independent Contractor, Independent Contractor will pay such excess amount to Company within fifteen (15) days after Company gives written notice to Independent Contractor regarding the excess offset amount that must be paid to Company. For example, only and not by way of limitation, if this Agreement was terminated and following termination it was determined pursuant to Section 6 that $10,000.00 in commissions are owed to Independent Contractor (prior to calculating any offsets pursuant to Section 6(c)) and Company is entitled to $12,000.00 in offsets pursuant to Section 6(c), Independent Contractor would owe $2,000.00 to Company.  If this Agreement is terminated due to a bad and/or grossly negligent act(s) of Independent Contractor including but not limited to: (i) fraud; (ii) material misrepresentation; (iii) willful disregard; (iv) wanton conduct; (v) reckless conduct; (vi) malicious conduct; or (vii) grossly negligent conduct, Independent Contractor acknowledges that, in additional to all other remedies or reservations that are available to the Company (which are expressly reserved and not waived), he/she/it will not be entitled to any portion of any outstanding monthly volume bonuses (including any whole amounts due or any pro-rata portion).

7. <u>Credit information</u>. If the potential customer is applying to have the Solar System financed by a third-party lending company, Independent Contractor is required to furnish Company with personal financial information (to the extent that Independent Contractor is reasonably able to do so).

8. <u>Product education; registration</u>. Within twenty (20) calendar days after signing this Agreement and prior to soliciting any orders for any of Company's products, Independent Contractor must participate in a Company product education session designed to educate Independent Contractor about the products offered and sold. If Independent Contractor engages any employees or agents to work with or on behalf of Independent Contractor in soliciting orders for any products, any such employees or agents must complete the aforementioned product education session before soliciting any such orders. Independent Contractor and any of its employee(s) or agents(s) shall endeavor to comply with applicable statutory and regulatory requirements for obtaining orders for Solar Systems.

9. <u>Marketing materials</u>. Independent Contractor will only use Company authorized marketing materials in connection with promoting any product or soliciting orders.

10. <u>Additional fees</u>. If the installation of any Solar System requires any out of the ordinary additional work to be performed or any out of the ordinary equipment to be installed (including, but not limited to, roof replacements or upgrades, roof water proofing protection, electrical system upgrades, multiple roof solar planes, ground mounted solar panels, or trenching), Company will, at its discretion, either charge the customer for any resulting additional expenses incurred by the Company and/or pay for such expenses itself (or some combination of both) and any expenses for any such out of the ordinary work or equipment (collectively, "**Additional Fees**") will be subtracted from the invoiced price of a Solar System for purposes of calculating the net price per watt and determining any commission owed pursuant to Section 6.

11. <u>Independent Contractor's expenses</u>. Independent Contractor will bear all expenses incurred by Independent Contractor in the performance of Independent Contractor's services hereunder, including but not limited to all automobile, travel, telephone, meals and entertainment expenses. Any expenses advanced to Independent Contractor by Company will be repayable to Company upon demand or, at Company's option, may be charged against and deducted from any commissions which are due, or which may become due to Independent Contractor. Independent Contractor expressly consents to the deductions set forth in the preceding sentence and authorizes Company to make such deductions from any commissions due or payable to Independent Contractor, including from any payment at the time of or after Independent Contractor's termination.

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

12. <u>Leads and Orders.</u>

    a. <u>Leads</u>. Company will maintain and operate a customer relationship management system (the "**CRM System**") to track leads and sales generated by Independent Contractor. Independent Contractor must provide any information requested by Company for purposes of Company operating its CRM System. Notwithstanding any other provision of this Agreement, Independent Contractor may not earn, and will not receive, any commission or any other compensation for any sale to any customer that, according to Company's records, was another sales representative's lead at the time when Independent Contractor obtained an order from that customer. If an Independent Contractor's generated lead is entered into the CRM System by Company and not converted to a sale within ninety (90) days after such entry, such lead will thereafter automatically be considered a Company generated lead.

    b. <u>Contract Forms</u>. All quotations to customers, orders from customers and/or other documents used in connection with the performance of Independent Contractor's duties hereunder will be on such forms as Company may from time-to-time prescribe.

    c. <u>Price and Terms of Orders</u>. All orders obtained by Independent Contractor will be at such prices and on such terms and conditions as Company may from time-to-time prescribe. No order obtained will bind Company unless accepted in writing by Company. Company may decide, in its sole election and discretion, to not accept any order. Discounts are not permitted without prior written agreement by Company.

    d. <u>Adjustments by Company</u>. Company retains the full right to deal directly with customer's orders and/or with customers as it deems appropriate, without any liability or obligation to Independent Contractor for any inaction or for any action so taken, including but not limited to the right to: (i) refuse, reject or cancel, or consent to the cancellation or return of, all or any part of a sales or purchase order, either before or after installation; (ii) grant credits, discounts or allowances before or after installation; (iii) refuse to install or cause, permit or allow delays in installation of all or any part of a sales or purchase order; and (iv) grant full or partial refunds for any Solar Systems purchased from Company.

    e. <u>Program Procedures and Acknowledgement of Rights and Responsibilities</u>. Independent Contractor must follow the Company Program Procedures and Acknowledgement of Rights and Responsibilities attached hereto as **<u>Exhibit C and Exhibit D</u>**, respectively, when submitting orders to Company. Company may, at its discretion, withhold commissions from Independent Contractor for any orders that are not submitted in accordance with the Program Procedures, Acknowledgement of Rights and Responsibilities, and/or that otherwise violate any of the terms of this Agreement.

    f. <u>Prohibited Acts</u>. The Company hereby expressly prohibits and disclaims any sales or solicitation acts and/or methodology of Independent Contractor that disregards or violates any applicable local, state and/or federal law(s), including but not limited to, Telephone Consumer Protection Act (TCPA), FTC laws, CAN-SPAM Act, Lanham Act, deceptive trade practices, consumer protection laws, state false advertising laws, laws protecting the aged, among others (the "Prohibited Acts"). The Company shall not be responsible for fines, liabilities, or penalties including actual or consequential damages resulting from any act, omission or negligence of an Independent Contractor that violates any applicable local, state and/or federal laws. Any breach of Independent Contractor of any applicable law(s) and/or engaging in prohibited acts and/or methodologies will be sufficient grounds for the Company to terminate this Agreement for cause.

        i. Independent Contractor expressly agrees to defend, indemnify and/or hold the Company, its subsidiaries and affiliates, and each of their respective owners, directors, officers, employees and agents harmless from and against any and all claims, liabilities, losses, fines, penalties, damages, judgments, expenses and/or costs, including, without limitation, reasonable attorneys' fees, arising out of or

relating to any sales or solicitation methodology that violates any applicable local, state and/or federal law, including but not limited to the Prohibited Acts, among others.

13. Arbitration. To the fullest extent allowed by law, any controversy, claim or dispute between Independent Contractor and Company (or any of its affiliated, subsidiary, or related entities, owners, directors, officers, employees and/or agents) relating to or arising out of this Agreement, Independent Contractor's service or compensation under this Agreement, or the cessation of this Agreement or Independent Contractor's service thereunder will be submitted to final and binding arbitration for determination in accordance with the American Arbitration Association, Commercial Rules of Procedure as the exclusive remedy for such controversy, claim or dispute. Venue for such arbitration will be exclusively in Sacramento County, California. The neutral, single arbitrator shall be jointly chosen by both parties either from a list of arbitrators supplied by the American Arbitration Association, or an alternate source by agreement of the parties. The decision of the arbitrator, including determination of the amount of damages suffered, if any, shall be exclusive, final and binding on the parties. The arbitrator will issue a reasoned, written decision, and will have full authority to award all remedies which would be available in court. Each side shall bear the expense of the arbitration proceeding equally unless otherwise agreed upon. Each side shall bear its own legal fees and expenses regarding any arbitration. Any judgment upon the award rendered by the arbitrator will be final and binding and may be entered in any court having jurisdiction thereof. Possible disputes covered by the above include but are not limited to breach of this Agreement, unpaid commissions, breach of contract, torts, violation of public policy, discrimination, harassment, or any other related claims, statutes or laws relating to Independent Contractor's relationship with Company.

14. BY AGREEING TO THE BINDING ARBITRATION PROVISION PROVIDED IN SECTION 13, ABOVE, BOTH INDEPENDENT CONTRACTOR AND COMPANY GIVE UP ALL RIGHTS TO TRIAL BY JURY. ARBITRATION MUST BE ON AN INDIVIDUAL BASIS. THIS MEANS NEITHER INDEPENDENT CONTRACTOR NOR COMPANY MAY JOIN OR CONSOLIDATE CLAIMS IN ARBITRATION BY OR AGAINST OTHER INDEPENDENT CONTRACTORS OF COMPANY, OR LITIGATE IN COURT OR ARBITRATE ANY CLAIMS AS A REPRESENTATIVE OR MEMBER OF A CLASS.

*E.C.*

Independent Contractor Initials

*D.B.*

Company Representative Initials

15. Confidentiality.

Proprietary Information. Independent Contractor understands that Company possesses and will possess Proprietary Information that is important to its business. For purposes of this Agreement, "**Proprietary Information**" is all information that was or will be disclosed to Independent Contractor by Company or that was or will be developed, learned, created, or discovered by Independent Contractor (or others) for or on behalf of Company, or that became or will become known by, or was or is conveyed to Company and has commercial value in Company's business, or that is developed at Company's facilities or with use of Company's equipment. Proprietary Information includes, but is not limited to, information (and all tangible items in any form incorporating, embodying or containing information) relating to: (i) all client/customer (including any potential clients/customers) lists, vendor lists and all lists or other compilations containing client, customer or vendor information (including any potential clients or customers); (ii) the CRM System; (iii) products, proposed products, research, product development, know-how, techniques, processes, costs, profits, advertising, advertising plans, markets, marketing plans, strategies, forecasts, sales and commissions, and unpublished information relating to technological and scientific developments; (iv) plans for future development and new product concepts; (v) all manufacturing or installation techniques or processes, documents, books, papers, drawings, schematics, models, sketches, computer programs, databases, and other data of any kind and descriptions including electronic data recorded or retrieved by any means;

(vi) the compensation, performance and other terms regarding Company's employees and independent contractors; (vii) software in various stages of development, and any designs, drawings, schematics, specifications, techniques, models, data, source code, algorithms, object code, documentation, diagrams, flow charts, research and development, processes and procedures relating to any software; and (viii) all other information that has been or will be given to Independent Contractor in confidence by Company (or any affiliate) concerning Company's actual or anticipated business, research or development, or that is received in confidence by or for Company from any other person or entity. Proprietary Information does not include information that: (i) is in the public domain through lawful means that do not directly or indirectly result from any act or omission of Independent Contractor in breach of any obligations hereunder; or (ii) was already rightfully known to Independent Contractor (other than in connection with this Agreement or any services previously provided by Independent Contractor for Company) without restriction on use or disclosure at the time of Company's disclosure to Independent Contractor.

a.  <u>Non-Disclosure</u>. Independent Contractor understands that this Agreement and the services to be provided pursuant to this Agreement create a relationship of confidence and trust between Independent Contractor and Company with regard to Proprietary Information. Independent Contractor will, at all times, both during and after the term of this Agreement, keep the Proprietary Information in confidence and trust. Independent Contractor will not, without the prior written consent of an authorized officer of Company: (i) copy, use or disclose any Proprietary Information; (ii) remove any Proprietary Information from the business premises of Company; and/or (iii) deliver any Proprietary Information to any person or entity outside Company. Notwithstanding the foregoing, Independent Contractor may use the Proprietary Information as may be necessary and appropriate in the ordinary course of performing services for Company pursuant to this Agreement.  For purposes of example only and not by way of limitation, Independent Contractor may not share: (i) his/her Apricot Solar Advisor training link and/or password; (ii) Apricot training videos; (iii) Apricot resources (e.g. the Apricot solar calculator), with any other third party not presently affiliated with the Company.

b.  <u>Return of Proprietary Information</u>. Independent Contractor agrees that upon termination of this Agreement for any reason or upon Company's request, Independent Contractor will promptly deliver to Company all Proprietary Information, any document(s) and/or media that contains any Proprietary Information (and all copies thereof), and any apparatus and/or equipment (and other physical property or any reproduction of such property), excepting only Independent Contractor's copy of this Agreement.  Due to the remote nature of the Independent Contractor's location of work and office (which is not under the control of the Company), this may include but not be limited to the Independent Contractor sharing temporary online access to their laptop and/or desktop computer(s) with the Company's IT Department Administrator using remote access software for the limited purpose of searching for and/or removing Company's Proprietary Information.

c.  <u>No False, Misleading, Defamatory or Abusive Language.</u> Independent Contractor agrees, at all times, that he/she/it shall not make or cause to be made, directly or indirectly, any statement to any third party against Company, its brands and/or service names, its fictitious business names, its affiliates, its current and former directors, its current or former officers, its current or former employees, its known agents and/or current and former Independent Contractors that is false, misleading, defamatory and/or abusive language. The Company may take actions consistent with breach of this Agreement should it determine that the other party has made false, misleading, defamatory and/or abusive language (whether written or oral).

d.  <u>Remedy for Breach.</u> Independent Contractor acknowledges that any breach or threatened breach of Sections 14(a)(b)(c)(d) of this Agreement will result in irreparable harm to the Company for which damages would be an inadequate remedy. Therefore, the Company shall be entitled to equitable relief, including an injunction, in the event of such breach or

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

threatened breach of Sections 14(a)(b)(c)(d) of this Agreement. Such equitable relief shall be in addition to Company's rights and remedies otherwise available at law and remedies provided under this Agreement.

16. <u>General Terms</u>.

    a.   Independent Contractor shall not commit any act or do anything which might reasonably be considered: (i) to be immoral, deceptive, scandalous or obscene; or (ii) to injure, tarnish, damage or otherwise negatively affect the reputation and goodwill associated with the Company or the Apricot brands.  For purposes of this Agreement, an Independent Contractor shall be deemed to have violated Section 16(a) of this Agreement if an Independent Contractor, at any time after the date of this Agreement: (i) is charged with committing a misdemeanor of moral turpitude that is punishable by a prison term of at least 6 months or a felony (regardless of the length of prison term associated with such offense); (ii) commits or is accused of committing an act involving moral turpitude under federal, state, or local law (regardless of whether or not such act involving moral turpitude is a misdemeanor or felony); (iii) violates the terms of any parole or probation to which such an Independent Contractor is or may become subject; or (iv) commits an act of significant public disrepute or becomes the subject of a scandal such that Company believes, in its sole discretion, that the marketability of the Company's corporate image has been or will be negatively affected.

    b.   Independent Contractor is not authorized to and will not contract obligations in the name of or on account of Company, or make any representations, guarantees or warranties with respect to any products of Company except as expressly authorized by Company. The Company shall have the right to reject or accept the orders of Solar System obtained by the Independent Contractor and the Company is not bound to any agreement until such agreement is accepted and signed by the Company.

    c.   Independent Contractor agrees that it will not use Company's name or any of its trade names, trademarks, service marks or Proprietary Information other than as authorized by Company. Independent Contractor is not authorized to make representations that it will, by itself or by Independent Contractor's employees, fulfill or perform any installation contract of Solar Systems. Independent Contractor also agrees that it shall take reasonable steps and ensure that its employees, agents or representatives comply with and not violate any applicable local, state or federal laws or regulations.

    d.   This Agreement contains the entire agreement between the parties, and supersedes and cancels all prior oral and written agreements, understandings, commitments and practices between the parties, including any and all prior sales representative agreements, channel partner agreements or other agreements regarding Independent Contractor providing services to Company or any its affiliates or predecessors (except as to any of Independent Contractor's surviving obligations under any prior agreement, such as the protection and nondisclosure of trade secrets). This Agreement may not be amended or altered in any way except by an instrument in writing duly executed by both parties; provided, however, that the commission rates may be changed by Company from time to time pursuant to Section 6.

    e.   No failure on the part of any party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof or of any other right, nor shall any single or partial exercise preclude any further or other exercise of such right or any other right.

    f.   Neither party has made any representations, warranties, commitments or assurances to the other party except as expressly stated in this Agreement. Company has not made any representations, warranties, commitments or assurances to Independent Contractor regarding the amount of commissions that Independent Contractor may earn pursuant to this Agreement.

Apricot - Independent Contractor
Representative Agreement

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

g.  This Agreement may not be assigned by Independent Contractor without Company's prior written consent, which consent may be withheld at Company's sole discretion for any reason. Company may assign this Agreement to: (i) any party into which Company may merge; (ii) any party that purchases all or substantially all of Company's assets; (iii) any party that is a majority owner of Company; (iv) any party that is a majority owned subsidiary of Company; or (v) any entity in which Dave Bengel, an individual, collectively owns a majority of the equity ownership interest in that entity or collectively own equity in that entity that represents a majority voting interest.

h.  This Agreement will be binding upon and will inure to the benefit of the parties hereto, and their successors and permitted assigns.

i.  This Agreement will be construed and enforced according to the internal laws of the State of California, regardless of any laws on choice of law or conflicts of law of any jurisdiction.

j.  Should any one of the provisions of this Agreement be determined to be void or unenforceable by an arbitrator or a court of competent jurisdiction, then in such event the remaining provisions of this Agreement will remain in full force and effect.

k.  Any notice to Company required or permitted under this Agreement will be given in writing to Company either by personal service on the President of Company or by registered or certified mail, postage prepaid, addressed to the President of Company at its then principal place of business. Any such notice to Independent Contractor will be given in a like manner and, if mailed, will be addressed to Independent Contractor at Independent Contractor's home or office address then shown in Company's files. For purposes of determining compliance with any time limit in this Agreement, a notice will be deemed to have been duly given: (a) on the date of service, if personally served on the party to whom it is to be given; or (b) on the fourth business day after mailing if mailed to the party to whom the notice is to be given in the manner provided in this paragraph.

l.  Independent Contractor will indemnify, hold harmless and defend Company against any and all direct losses, liabilities, damages and expense (including direct losses suffered by Company and all reasonable attorneys' fees) arising from: (i) any claim alleging any negligence, reckless, wanton and/or willful misconduct by Independent Contractor or any of its agents or employees; (ii) any breach of this Agreement by Independent Contractor or any of its employees or agents; and/or (iii) any claim made by any person or entity on account of an alleged failure by Independent Contractor to satisfy any tax, withholding or other similar regulatory or statutory obligations, or arising out of Independent Contractor employing or otherwise engaging any person(s) to provide any services directly or indirectly related to the services provided by Independent Contractor pursuant to this Agreement.

m.  Any and all rights and powers granted to Company pursuant to this Agreement may, unless the context expressly requires otherwise, be exercised by Company in its sole and absolute discretion.

n.  Company will not be liable to Independent Contractor (under any circumstances) for any consequential, punitive, incidental, exemplary or special damages (including without limitation loss of business opportunity or lost profit) arising out of or related to this Agreement or any act or omission by Company or Independent Contractor.

o.  As used in this agreement, the words "include", "including" and variations on those words are used inclusively and mean "includes without limitation" unless the context expressly indicates otherwise. As used in this Agreement, the word "or" is inclusive and means "and/or" unless the context expressly indicates otherwise.

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

p. This Agreement may be executed in one or more counterparts. Each such counterpart will be deemed to be an original and all such counterparts will together constitute one and the same instrument. This Agreement may be executed by a party's signature transmitted by facsimile ("fax") or electronically transmitted by e-mail (in pdf format or other electronic format), and copies of this Agreement executed and delivered by means of faxed or electronic signatures will have the same force and effect as copies hereof executed and

delivered with original signatures. All parties hereto may rely upon faxed or electronic signatures as if such signatures were originals. Any party executing and delivering this Agreement by fax or an electronic copy transmitted by e-mail will promptly thereafter deliver a counterpart signature page of this Agreement containing said party's original signature. All parties hereto agree that a faxed or electronic signature page may be introduced into evidence in any proceeding arising out of or related to this Agreement as if it were an original signature page.

q. Sections 6,11,13,14, 15, and 16(h) through 16(n) will survive any termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

Independent Contractor:

Edmund Coutan

a   Individual

By: _____Edmund Coutan_____

Print Name: Edmund Coutan

Company:

NEVADA SOLAR ENERGY, LLC

a Nevada limited liability company

By: _____David Bengel_____

Print Name: David Bengel

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

## EXHIBIT A

## NTP GUIDELINES

Steps to complete to get paid NTP (initial payment):

1. Execute any and all agreements necessary in accordance with the finance company(s) chosen by you and your customer and, if applicable, complete customer welcome call with finance company. Submit any supplemental documents requested by finance company to receive NTP such as Mortgage statement, Death Certificate, property tax records etc.

2. Create a folder for your customer in your Dropbox and place all required documents in the Dropbox folder.

3. Upload the following docs: (a) utility bill; (b) signed utility NEM agreement; (c) pictures of job, deposit check, financing approval image, MSP, or any other necessary documents; (d) Signed Freedom Forever, LLC's Supply and Installation Agreement (the "Freedom Agreement") (download from your Portal);

4. Obtain an in-home scrub in the Scrub Channel; and

5. Submit your Project into the Freedom Dealer Portal.


Initial payment for new deal submissions will be paid after Freedom has paid apricot on the pay cycle following SOW confirm stage of job.
The Company will pay a $500 advance towards the commission at SOW approval.  The balance of your commission will be paid by Company after the project has funded and Freedom has paid Apricot.

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

**EXHIBIT B**

**Submission of Completed Paperwork**

"**Submission of Completed Paperwork**" means Independent Contractor submitting to Company's Dropbox all completed paperwork required by Company (at Company's discretion) regarding a sale of a Solar System before Company conducts a site audit regarding that Solar System. Such paperwork includes, but is not necessarily limited to, the following:

1. <u>Electric Utility Bill</u> – Must have: Meter #, Service Acct #, Address, and Customer Name (all usually found on page one of the bill);

2. <u>Net Energy Metering (NEM) Agreement</u> – must have correct form and it must be signed by the person or entity named on the electric utility bill;

3. <u>Signed Contract(s)</u> – Finance documents and Freedom Agreement;

4. <u>Site Audit Form</u> – completely filled out;

5. <u>HOA Information</u> – contact information, application, signatures (as needed) regarding any HOA (Home Owners' Association) that governs the proposed installation site; and

6. <u>Pre-Site Assessment</u> – submitted with panels and layout selected.

## EXHIBIT C

## Program Procedures

These Company Program Procedures must be followed by Independent Contractor when submitting a Project to Freedom Forever.

1. All customers must be qualified for credit requirements to finance a Solar System (if applicable). Consult Company for qualification tools provided.

2. Independent Contractor agrees to provide prospective customers a copy of the Freedom Agreement.

3. Independent Contractor must obtain a copy of the signed Freedom Agreement and a copy of the signed financing application and upload a copy of each signed document into Company's Apricot Dropbox.

4. Independent Contractor must also submit the following documents to Company's Apricot Dropbox for any submitted order: (i) a copy of a recent electric utility bill for the prospective customer including the meter number, account number, customer name and customer address (such information is usually found on the first page of the electric bill); (ii) Net Energy Metering (NEM) Agreement - over or under 10kW (10,000 watts) (make sure you have the correct form and that it is signed by the person named on the electric bill); (iii) if applicable, HOA information including contact information, application and signatures as needed; and (iv) and any other Company requested related documents or information (e.g. ground mount solar system design images.)

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

# EXHIBIT D

## Acknowledgement of Rights and Responsibilities

1. Independent Contractor ("You") agrees to not provide any tax and/or legal advice to the potential customer. Independent Contractor agrees to not communicate to the potential customer (including but not limited to verbally, via text or otherwise) that the potential customer will be receiving a tax rebate, check, deposit, and/or a payment from any party in reference to a tax credit incentive (including but not limited to Freedom Forever, Apricot Solar, or any other company affiliated with Apricot Solar). Since every potential customer's financials will be different, Independent Contractor agrees to not promise or guarantee that the potential customer will receive the tax credit incentive. Independent Contractor agrees to only communicate to the potential customer that (for example), **"They may be entitled to receive a tax incentive credit, depending upon their personal tax liability. They should contact their personal tax advisor to determine if they qualify for the tax incentive credit."**

2. Independent Contractor agrees to not "sell to site audit" (telling the customer, for example, that they are only signing documents in order to receive the site audit), thus misleading the customer into believing that they are not actually signing binding legal documents, contracts, loan documents, etc. **Independent Contractor agrees to be honest and fully transparent with the homeowner at all times, informing them that they are signing binding legal contracts and loan documents during the sales appointment.**

3. Independent Contractor agrees to not deceive the potential customer and/or be vague or obscure about the potential customer's estimated monthly payments and/or the total amount of the potential customer's loan. **Independent Contractor agrees to make sure the potential customer knows what their monthly payment will be. Independent Contractor agrees to make sure the potential customer knows what their monthly payment will be without the tax credit incentive in the event that the potential customer does not qualify for the tax credit incentive or they do not apply the tax credit incentive towards the balance of the loan. If using a finance program where the monthly payment will re-amortize after 18 months, the independent contractor must make the re-amortization event clear to the potential customer. Independent Contractor must inform potential customer of what their payment will be if they qualify for the full tax credit incentive and if the potential customer elects to apply the tax credit incentive monies towards the loan.**

4. Independent Contractor agrees to not give the potential customer a definite timeline of install, inspection date, permission to operate, etc. **Independent Contractor agrees to set proper estimated timelines and expectations related to each solar system Project and inform each potential customer that the estimated timelines are "subject to change."**

5. If the Independent Contractor is offering the potential customer a rebate of up to $2,000, the Independent Contractor agrees to not tell the potential customer that, "They will receive their rebate soon after the solar install" (except under unusual circumstances, e.g., a global pandemic). **Please note that if you offer a rebate to the potential customer, make sure they know they will not receive the rebate until the system receives its permission to operate from the utility. It will then take up to 2 weeks after that date for the Freedom Accounts Payable Department to process the rebate. Please make sure that Freedom Forever is aware of the rebate upon submission of the potential customer's agreement.**

6. Independent Contractor agrees to be reasonably available to communicate with the potential customer through the permission to operate stage granted by the utility. **If the potential customer reaches out to the Independent Contractor after the sale, the Independent Contractor agrees to respond to the customer in a timely manner. The Independent Contractor acknowledges that since former customer referrals are a good source of new potential customers, therefore it is important to keep up positive customer relations.**

7. Independent Contractor agrees that if he/she is providing a preliminary roof quote at time of sale, the Independent Contractor agrees to not tell potential customers that the preliminary quote is the "exact" price of the re-roof services and materials. **Independent Contractor agrees to tell the potential customers that the quote is an estimated price only and is subject to change after site audit and after the roofing company has assessed the roof and provided a final scope of work and price quote.**

8. Independent Contractor agrees to not tell potential customers that the utility cost offset (electricity bill vs. solar energy cost), that is provided to them at time of sale, will be their exact offset. **Independent Contractor agrees to**

Document Ref: GCNSR-ZXUGP-KPEVM-QJTLP

only tell the potential customer that the exact offset will be determined after the completion of Freedom Forever's site audit (when shade readings and measurements are taken).

9. If the potential customer chooses the cash purchase option, the Independent Contractor agrees to inform the potential customer that the milestone payments are non-negotiable.

By way of example only, the Independent Contractor should clearly explain to the potential customer that the following milestone payments are non-negotiable:

• 10% of the Project cost but not more than $1,000.00, is the deposit amount (on signing/date of sale);
• 80% is due at time of installation; and
• the remaining 20% is due at the time of final inspection.

10. Independent Contractor agrees to not enter into contracts directly with persons who lack the capacity to contract including minors, dependent adults, and/or those potential customers who, after the Independent Contractor makes a reasonable assessment of the potential customer's mental capacity, Independent Contractor has a good faith belief that the potential customer is incompetent and/or lacks the capacity to contract.  If the Independent Contractor is uncertain of the potential customer's capacity to contract and/or mental condition, then the Independent Contractor agrees to ask the potential customer if they have a person with a Power of Attorney who makes financial decisions for them regarding their home and its improvement.  If the Independent Contractor discovers that there is no person designated by the potential customer as having a power of attorney, the Independent Contractor agrees to contact their trainer and/or mentor, if applicable, inform them of the circumstances, and disqualify that appointment.

11. If applicable, if Independent Contractor is pursuing potential homeowners who live in California, in order to receive Company-provided potential California-based customer solar leads, Independent Contractor must first: (1) Complete and pass all required Independent Contractor training; (2) Complete at least five (5) self-generated solar installations from a lead that originated from Independent Contractor (e.g. family, neighbors, friends, associates, etc.); and, if applicable, (3) if the Independent Contractor is soliciting solar system agreements in the State of California, the Independent Contractor must first possess a Home Improvement Salesperson ("HIS") license with the California Contractor State License Board.

12. Independent Contractor acknowledges that the Company can elect, in their sole discretion, to stop providing Company-provided potential customer solar leads if any single and/or all of the following events occur during any 30-day period after Company-provided potential customer solar leads begins: (1) if the closing ratio of leads provided by the Company drops below 12.5%; (2) if the realization rate for signed solar agreements originating from Company-provided potential customer solar leads falls below 60%; (3) if the Independent Contractor fails to properly provide a detailed disposition regarding the outcome of a sales appointment originating from a self-generated lead and/or a Company-provided potential customer solar lead; (4) if the Independent Contractor fails to show up to one (1) or more potential customer appointments; and/or (5) if an independent Contractor does not provide Company with at least two weeks prior written notice that they will be suspending their Independent Contractor services and/or need to take time off of the lead calendar.

I acknowledge that I have read, understand and agree to abide by the statements made in this Acknowledgement of Rights and Responsibilities, above.  I understand that non-compliance of any part of these statements can result in the Independent Contractor's suspension, termination, and/or personal liability related to same.

**INDEPENDENT CONTRACTOR SIGNATURE**

_Edmund Coutan_

**Dated:** 10 / 05 / 2020

**INDEPENDENT CONTRACTOR PRINTED NAME**

Edmund Coutan

Apricot - Independent Contractor
Representative Agreement

16

# Signature Certificate

Document Ref.: GCNSR-ZXUGP-KPEVM-QJTLP

Document signed by:



### Edmund Coutan

Verified E-mail:
edmund@apricotsolar.com

IP: 71.197.126.25          Date: 06 Oct 2020 17:35:14 UTC



Document completed by all parties on:
06 Oct 2020 17:35:14 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.

